# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Steven Neve, Individually and as Personal Representative of the Estate of Vicki Sue Neve, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>Boar's Head Provisions Co., Inc.,<br><br>Defendant. | **Case No.** 2:26-cv-00091-BHH<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Steven Neve, individually and as Personal Representative of the Estate of Vicki Sue Neve, deceased, by and through undersigned counsel, brings this Complaint against Defendant Boar's Head Provisions, Co., Inc. ("Boar's Head") and alleges, upon information and belief, as follows:

## INTRODUCTION

1.     The above-styled case arises from one of the largest and most deadly food poisoning disasters in United States' history: the 2024 Boar's Head *Listeria* Outbreak.

2.     Defendant Boar's Head produced, distributed, and sold deli meat contaminated with *Listeria monocytogenes* throughout the country, thereby exposing countless people to the risk of severe illness and/or death.

3.     Decedent Vicki Sue Neve ("Decedent") was one such person. She consumed Boar's Head ham that was grossly contaminated with the deadly *Listeria* bacteria, fell deathly ill with Listeriosis, and was hospitalized before succumbing to her illness on August 7, 2024. This case seeks to hold Boar's Head responsible for the harm caused by its manufacture, distribution and sale of the contaminated product that was consumed by Decedent and caused her serious injuries

and death and caused her spouse and wrongful death beneficiary, Plaintiff Steven Neve, to suffer the loss of her companionship, comfort, love, and guidance; extreme mental anguish, emotional pain and grief; and financial expenses associated with Decedent's death.

4.      Plaintiff brings this case in his capacity as Personal Representative of the Estate of Vicki Sue Neve asserting a cause of action for wrongful death, pursuant to S.C. Code Ann. § 15-51-10, and a survivor cause of action for his wife's pain and suffering prior to her death, pursuant to S.C. Code Ann. § 15-5-90, and in his individual capacity for the loss of the companionship of his spouse, pursuant to S.C. Code Ann. § 15-75-20.

## PARTIES

5.      Plaintiff Steven Neve is the surviving spouse and a wrongful death beneficiary of the Decedent, Vicki Sue Neve. He is the Personal Representative of the Estate of Vicki Sue Neve. At all times relevant to this Complaint, both Mr. and Mrs. Neve were citizens and residents of Dorchester County, South Carolina.

6.      Defendant Boar's Head is, and at all times relevant and material to the acts, omissions, occurrences, and events made the basis of this Complaint was, a corporation organized under the laws of the State of Delaware with its principal place of business and corporate headquarters located at 1819 Main Street, Suite 800, Sarasota, Florida, 34236. It transacts business throughout the United States and in South Carolina. Defendant Boar's Head is a foreign corporation and not a resident of the State of South Carolina.

## JURISDICTION AND VENUE

7.      This Court has proper jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendant.

8.     Venue is proper in the United States District Court for the District of South Carolina pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events, occurrences, acts, or omissions giving rise to the claims occurred in this District, and Plaintiff is domiciled in this District.

## FACTUAL ALLEGATIONS

9.     This is an action against Defendant for personal injuries, wrongful death, and loss of consortium arising from the manufacture, distribution, and sale of food contaminated with the bacteria *Listeria monocytogenes* ("*Listeria*") that was consumed by Decedent and caused her serious injuries, pain and suffering, and death, and caused her estate and her surviving spouse and wrongful-death beneficiary, Plaintiff Steven Neve, to suffer the loss of his spouse; the loss of comfort, love, and guidance from her; the loss of services, protection, care, and assistance expected to be performed by her; extreme mental anguish, emotional pain, and grief; and financial expenses associated with the health care and then death of the Decedent, entitling Plaintiff to compensatory damages, and because of the serious nature of Defendant's tortious conduct, punitive damages for these harms and losses and any and all other damages recoverable under the laws of the State of South Carolina.

### *Listeria*

10.     *Listeria* is a gram-positive, rod-shaped bacterium that is ubiquitous and can grow under either anaerobic (without oxygen) or aerobic (with oxygen) conditions. It is one of the most virulent and deadly foodborne pathogens, with a fatality rate of more than 20%.

11.     Severe *Listeria* infections are responsible for high hospitalization rates (91%) among the most common foodborne pathogens, may cause sporadic cases or large outbreaks, and can persist in food-processing environments and multiply at refrigeration temperatures, making

*Listeria* a significant public health concern.[1]

12.     Food contaminated with *Listeria* usually looks, smells, and tastes normal, meaning a consumer has no warning of contamination.

13.     According to the Centers for Disease Control and Prevention ("CDC"), symptoms of a *Listeria* infection can develop any time from the same day of exposure to 70 days after eating contaminated food. According to the Food and Drug Administration ("FDA"), gastroenteritis (or non-invasive illness) has an onset time of a few hours to 3 days, while invasive illness can have an onset varying from 3 days to 3 months.

14.     Listeriosis is an invasive illness resulting from consumption of food contaminated with *Listeria*. The disease primarily affects persons of advanced age, pregnant women, newborns, and adults with weakened immune systems. However, people without these risk factors can also be affected. Virtually all individuals who contract listeriosis require hospitalization.

15.     The body's defense against *Listeria* is called "cell-mediated immunity" because the success of defending against infection depends on our cells (as opposed to antibodies), especially lymphocytes, otherwise known as "T-cells". As a result, individuals whose cell-mediated immunity is suppressed are more susceptible to the devastating effects of listeriosis.

16.     According to the FDA, CDC, and other public health organizations, individuals at increased risk for being infected and becoming seriously ill from listeriosis include the following groups:

- Pregnant women: They are about 10-20 times more likely than other healthy adults to get listeriosis. About one-third of listeriosis cases happen during

---

[1] Arslan, F., Meynet, E., Sunbul, M. *et al.* The clinical features, diagnosis, treatment, and prognosis of neuroinvasive listeriosis: a multinational study. *Eur J Clin Microbiol Infect Dis* 34, 1213–1221 (2015). https://doi.org/10.1007/s10096-015-2346-5

pregnancy. Fetuses are also highly susceptible to infection and severe complications.

- Newborns: Newborns can develop life-threatening diseases from perinatal and neonatal infections.

- Persons with weakened immune systems.

- Persons with cancer, diabetes, kidney, or gastrointestinal disease.

- Persons with HIV/AIDS: Individuals with HIV/AIDS are almost 300 times more likely to get listeriosis than people with healthy immune systems.

- Persons who take glucocorticosteroid medications (such as cortisone).

- Persons of advanced age: One risk assessment showed people over 60 years old were 2.6 times more likely to develop listeriosis than the general population. And in 2011, the median age of diagnosed cases in people who were not pregnant was 71 years old.

17.    Milder cases of listeriosis usually consist of the sudden onset of fever, chills, severe headache, vomiting, and other flu-like symptoms. The CDC notes that infected individuals may develop fever, muscle aches, and gastrointestinal symptoms such as nausea or diarrhea. When present, the diarrhea usually lasts 1-4 days, with 12 bowel movements per day at its worst.

18.    The more severe form of listeriosis occurs when the bacteria infects parts of the body that are typically sterile, such as the blood, brain, liver, and cerebral spinal fluid. The presence of bacteria in these areas triggers the immune response and can lead to more severe symptoms. *Listeria* has a specific affinity for the central nervous system (CNS), especially in cell-mediated immunodeficient individuals.[2]

19.    For those persons who suffer a *Listeria* infection that does not resolve on its own, the complications can be numerous and possibly severe. The most common complication is septicemia (bacterial infection in the blood), with meningitis being the second most common.

_____

[2] Arslan, F., Meynet, E., Sunbul, M., Sipahi, O. R., Kurtaran, B., Kaya, S., … Mert, A. (2015, June). *The clinical features, diagnosis, treatment, and prognosis of neuroinvasive listeriosis: a multinational study*. European journal of clinical microbiology & infectious diseases: official publication of the European Society of Clinical Microbiology. https://www.ncbi.nlm.nih.gov/pubmed/25698311.

Other complications can include inflammation of the brain or brain stem (encephalitis), brain abscess, inflammation of the heart-membrane (endocarditis), septic arthritis, osteomyelitis (infection in the bone), and localized infection, either internally or of the skin.

20.     Death is the most severe consequence of listeriosis, and it is tragically common. The CDC has estimated that *Listeria* is the third leading cause of death from foodborne illness, with approximately 260 of 1,600 people diagnosed dying from their infections. For example, based on 2018 FoodNet surveillance data, 96% of 126 *Listeria* cases ended up in the hospital, the highest hospitalization rate for pathogenic bacterial infection. This data showed a fatality rate of 21%. According to the FDA, the case-fatality rate increases substantially based on complications, possibly reaching rates of 70% in cases with listeria meningitis, 50% in septicemia cases, and over 80% for perinatal/neonatal infections. In one US study, *Listeria* was reportedly the cause of nearly 4% of all cases of bacterial meningitis.

### The *Listeria* Rule

21.     Ready-to-eat foods are a notable and consistent source of *Listeria*. For example, a research study done by the *Listeria* Study Group found that *Listeria* grew from at least 1 food specimen in the refrigerators of 64% of persons with a confirmed *Listeria* infection (79 of 123 patients), and in 11% of more than 2,000 food specimens collected in the study. Moreover, 33% of refrigerators (26 of 79) contained foods that grew the same strain with which the individual had been infected, a frequency much higher than would be expected by chance.

22.     *Listeria* can be killed by cooking or pasteurizing food products; however, contact with *Listeria* after such a "kill-step" will re-contaminate the food product.

23.     This risk is heightened because *Listeria* tends to thrive in food processing environments, particularly in floor drains and other cool damp areas. Moreover, *Listeria* can be

easily transferred from one area of a processing facility to another through various means such as water, mist, simple touching of equipment, or on workers and their clothes, shoes, and hands.

24.     Additionally, in contrast to most other harmful bacteria, *Listeria* will continue to grow slowly on foods stored in a refrigerator, and freezing has very little detrimental effect on the organism.

25.     These characteristics render ready-to-eat deli meats particularly susceptible to *Listeria* contamination.

26.     The risks of deli meat contamination with *Listeria* have been well-known and documented in the industry for decades, particularly because of a massive turkey deli meat outbreak in 2002 in which 7 individuals were killed and 3 pregnant women lost their unborn children.

27.     The danger posed by the risk of *Listeria* in ready-to-eat meats prompted the United States Department of Agriculture ("USDA") to declare the bacterium an adulterant in these kinds of meat products and, as a result, to adopt a zero-tolerance policy for the presence of this deadly pathogen. 9 CFR § 430. Accordingly, *Listeria* "is a hazard that establishments producing ready-to-eat meat products must control through Hazard Analysis and Critical Control Point plans, prevent in the processing environment through a Sanitation Standard Operating Procedure, or prevent through another prerequisite program[.]" *Id*. This means that *any amount* of the bacteria in deli meats renders the product adulterated within the meaning of the United States Food, Drug, and Cosmetic Act.

28.     As such, responsible manufacturers of deli meat must maintain and follow strict hygienic practices and sanitation procedures in their processing facilities and must implement robust environmental and product testing programs to prevent the contamination of either their

products or their processing facilities with *Listeria.*

29.    To protect consumers of ready-to-eat meat products, the USDA's Food Safety and Inspection Service ("FSIS") has established the "*Listeria* Rule" to prevent *Listeria* from entering the stream of consumption.

30.    The *Listeria* Rule provides that to maintain the sanitary conditions necessary to prevent products contaminated with *Listeria* from entering the stream of consumption, an establishment producing ready-to-eat meat products, like Defendant, must incorporate one of the following three "Alternatives" into its operations:

> *Alternative 1.* The process includes a post-lethality treatment to reduce or eliminate *Listeria* in the product and an antimicrobial agent or process to limit or suppress growth of *Listeria* in the product.
>
> *Alternative 2.* Use of either a post-lethality treatment (which may be an antimicrobial agent) that reduces or eliminates microorganisms on the product *or* an antimicrobial agent or process that suppresses or limits growth of *Listeria.*
>
> *Alternative 3.* Use of sanitation measures only to control *Listeria* in the processing environment to prevent product contamination.

9 C.F.R. § 430.4(b).

31.    Defendant chose Alternative 3 – sanitation only – to protect against *Listeria* contamination.

32.    As a result, Defendant was required by 9 C.F.R. § 430.4(b)(3)(i) and (ii) to take on the following additional duties:

> (i) If an establishment chooses this alternative, its sanitation program must:
>
> (A) Provide for testing of food contact surfaces in the post-lethality processing environment to ensure that the surfaces are sanitary and free of *L. monocytogenes* or of an indicator organism;
>
> (B) Identify the conditions under which the establishment will implement hold-and-test procedures following a positive test of a food-

contact surface for an indicator organism;

(C) State the frequency with which testing will be done;

(D) Identify the size and location of the sites that will be sampled; and

(E) Include an explanation of why the testing frequency is sufficient to ensure that effective control of *L. monocytogenes* or of indicator organisms is maintained.

(ii) An establishment producing a deli product or a hotdog product, in addition to meeting the requirements of paragraph (b)(3)(i) of this section, must meet the following requirements:

(A) The establishment must verify that the corrective actions that it takes with respect to sanitation after an initial positive test for *L. monocytogenes* or an indicator organism on a food contact surface in the post-lethality processing environment are effective by conducting follow-up testing that includes a targeted test of the specific site on the food contact surface area that is the most likely source of contamination by the organism and such additional tests in the surrounding food contact surface area as are necessary to ensure the effectiveness of the corrective actions.

(B) During this follow-up testing, if the establishment obtains a second positive test for an indicator organism, the establishment must hold lots of product that may have become contaminated by contact with the food contact surface until the establishment corrects the problem indicated by the test result.

(C) In order to release into commerce product held under this section, the establishment must sample and test the lots for *L. monocytogenes* or an indicator organism using a sampling method and frequency that will provide a level of statistical confidence that ensures that each lot is not adulterated with *L. monocytogenes.* The establishment must document the results of this testing. Alternatively, the establishment may rework the held product using a process that is destructive of *L. monocytogenes* or the indicator organism.

33.     Regardless of the alternative chosen by a producer, to comply with the *Listeria* Rule a ready-to-eat meat producer must, among other things, "maintain sanitation in the post-lethality processing environments in accordance with part 416." 9 CFR § 430.4(c)(3).

34.     The minimum standards set forth in 9 CFR § 416 include:

(A) Buildings, including their structures, rooms, and compartments must be of sound construction, must be kept in good repair, and be of sufficient size to allow for processing, handling, and storage of product in a manner that does not result in product adulteration or the creation of insanitary conditions.

(B) Walls, floors, and ceilings within establishments must be built of durable materials impervious to moisture and be cleaned and sanitized as necessary to prevent adulteration of product or the creation of insanitary conditions.

(C) Rooms or compartments in which edible product is processed, handled, or stored must be separate and distinct from rooms or compartments in which inedible product is processed, handled, or stored, to the extent necessary to prevent product adulteration and the creation of insanitary conditions.

(D) Buildings must have adequate ventilation to control odors, vapors, and condensation to the extent necessary to prevent adulteration of product and the creation of insanitary conditions must be provided.

(E) Plumbing systems must be installed and maintained to prevent adulteration of product, water supplies, equipment, and utensils and prevent the creation of insanitary conditions throughout the establishment.

(F) All food-contact surfaces, including food-contact surfaces of utensils and equipment, must be cleaned and sanitized as frequently as necessary to prevent the creation of insanitary conditions and the adulteration of product.

(G) Non-food-contact surfaces of facilities, equipment, and utensils used in the operation of the establishment must be cleaned and sanitized as frequently as necessary to prevent the creation of insanitary conditions and the adulteration of product.

(F) Products must be protected from adulteration during processing, handling, storage, loading, and unloading at and during transportation from official establishments.

35.     If a ready-to-eat meat producer fails to comply with the *Listeria* Rule and the basic sanitation requirements of 9 C.F.R. § 416, then an environment in which *Listeria* thrives is created.

36.     Once a food product, including deli meat, is adulterated with *Listeria*, the pathogen can easily be transferred to other food products or food production surfaces if strict sanitation procedures are not followed. For example, if a knife, deli slicer, or other cutting utensil is used to cut into deli meat that is adulterated with *Listeria* and is not properly cleaned and sanitized

immediately thereafter, pathogens remaining on the knife or slicer can cross-contaminate other food products and surfaces. This problem is particularly significant in the case of cross contamination of ready-to-eat foods, since they are not subject to any further "kill-steps" necessary to deactivate or kill the pathogens.

37.    Because of the failures of producers of ready-to-eat meat like Defendant to follow these basic sanitary standards, as well as the risks posed by *Listeria*, the CDC, in collaboration with state public health officials, actively monitors listeriosis cases throughout the country. This allows state and federal officials to determine the source and cause of a *Listeria* outbreak and to attempt to limit the resulting harm.

### The Boar's Head *Listeria* Outbreak

38.    As part of their monitoring, state and CDC labs routinely subject samples of *Listeria* obtained from infected individuals to a genetic subtyping process known as Whole Genome Sequencing ("WGS"). The results, which are analogous to a genetic fingerprint, are subsequently uploaded into a national database used to determine whether illnesses were caused by a common genetic strain of *Listeria*.

39.    Through the use of this WGS system, the CDC detected a unique genetic pattern of *Listeria* among listeriosis patients in June and July of 2024.

40.    As of November 19, 2024, the CDC had identified 61 people from 19 states who had contracted this unique strain of *Listeria* (hereafter the "Outbreak Strain"). Sixty of those individuals were hospitalized because of their illness, with 10 deaths reported. According to the CDC, the true number of sick people in this outbreak is likely higher than the number reported, and the outbreak may not be limited to the states with known illnesses.

41.    As part of the inquiry into the above-referenced outbreak, the CDC, USDA, FSIS,

state, and local public health officials conducted an extensive epidemiological investigation to determine the source of the Outbreak Strain.

42.    Food consumption histories were obtained for individuals afflicted by the Outbreak Strain. Of the 48 people able to be interviewed by public health investigators, 45 (94%) reported eating deli meat. Of those individuals, 43 (96%) reported eating meat sliced at a deli, while the other 2 could not recall if their meats were sliced at the deli.

43.    Additionally, the CDC conducted an analysis comparing foods reported by people in this outbreak to foods reported by people who got sick with *Listeria* but were not part of an outbreak. The analysis showed that people in this outbreak were more likely to eat deli-sliced turkey and liverwurst. This analysis showed that deli-sliced liverwurst and turkey were likely vehicles for the Outbreak Strain.

44.    On or about July 17, 2024, officials from the Maryland Department of Health and Baltimore City Health Department collected an unopened Boar's Head liverwurst product and tested it for the presence of *Listeria*. The results of that testing were positive.

45.    After this positive test became known, Defendant initiated a voluntary limited recall of certain liverwurst and other products on July 26, 2024.

46.    The positive *Listeria* sample was sent to the CDC for further testing to confirm whether it matched the Outbreak Strain; on July 30, 2024, the CDC confirmed that the *Listeria* found in the Boar's Head liverwurst was indeed the Outbreak Strain.

47.    On July 30, 2024, Defendant expanded its recall to include approximately 7 million additional pounds of ready-to-eat deli meat (including varieties of liverwurst, ham, and bologna) and poultry products, all produced at its Jarratt, Virginia processing facility.[3] This expanded recall

---

[3] https://www.fsis.usda.gov/recalls-alerts/boars-head-provisions-co--recalls-ready-eat-liverwurst-and-other-deli-meat-products

included 71 products produced between May 10, 2024, and July 29, 2024, under Defendant's Boar's Head and Old Country brand names. These items included meat intended for slicing at retail delis as well as some packaged meat and poultry products sold at retail locations with "sell by" dates ranging from 29-JUL-2024 through 17-OCT-24.

48.     The products subject to recall were distributed to retail locations nationwide, and some were exported to the Cayman Islands, Dominican Republic, Mexico, and Panama. The products shipped to retail stores bore establishment number "Est. 12612" or "P-12612" inside of the USDA mark of inspection on the product labels.

49.     The Boar's Head products that were eventually subject to recall were shipped to the Publix at Oakbrook Shopping Center in Dorchester County, South Carolina, where Plaintiff purchased deli meats, including Defendant's ham, prior to the development of his wife's severe illness and injuries as described below.

50.     In January 2025, FSIS released its initial report detailing findings from its investigation into the Outbreak Strain, the cause of the outbreak, and Defendant's culpability for it.

51.     The FSIS Report and a review of publicly available noncompliance reports reveal that Defendant has operated with inadequate sanitation practices and chronic noncompliance with Sanitation Standard Operating Procedures and Sanitation Performance Standards, the *Listeria* Rule, and the sanitation requirements of 9 CFR § 416 at its Jarratt, Virginia facility since at least January 2022. Defendant's unsanitary practices and procedures allowed the growth and sustained presence of *Listeria* at its Jarratt, Virginia facility.

52.     The FSIS Report and the noncompliance reports specifically show that between January 2022 and September 2024 Defendant had the following chronic failures in sanitation

procedures and protocols at its Jarratt, Virgina facility:

    a. Failure to adequately clean its equipment and ready-to-eat deli processing area resulting in the consistent presence of meat and fat residue from previous days' production;

    b. Failure to maintain sanitary conditions during processing, handling, and storing of exposed ready-to-eat meat products;

    c. Failure to prevent cross-contamination by employees crossing production lines;

    d. Failure to prevent cross-contamination by equipment, like a pallet jack, moving freely about, in, and through the ready-to-eat meat processing and storage areas;

    e. Failure to properly store ready-to-eat meat products;

    f. Permitting moisture and condensation to persist in ready-to-eat meat production and storage areas;

    g. Permitting condensation to drip on exposed ready-to-eat meat product;

    h. Permitting fans to blow condensation directly on ready-to-eat meat products; and,

    i. Causing and contributing to wet conditions by allowing and not correcting cracks, holes, broken flooring, rust, beaded condensation, and peeling caulk.

53.    As a result of these chronic unsanitary conditions and its failure to follow the *Listeria* Rule and the USDA's sanitation rules, Defendant allowed the Outbreak Strain to grow, survive, and thrive. Condensation, a known risk for *Listeria*, was present throughout the Jarratt, Virginia facility, and the years long failure by Defendant to adequately clean equipment allowed a substrate and biofilm to form on equipment and other surfaces making the Outbreak Strain resistant to cleaning regimens.

54.    Beyond issues like paperwork lapses and leftover meat on equipment, the inspection records show inspectors faulted Defendant several times for mold and mildew building up in many locations throughout the company's facility in Jarratt, Virginia. In July 2024, federal inspectors found what looked to be mold and mildew around the hand-washing sinks for the

workers tasked with handling meats that are supposed to be ready-to-eat. Mold was also found building up outside of steel vats used by the plant, as well as in holding coolers between the site's smokehouses. "A black mold like substance was seen throughout the room at the wall/concrete junction. As well as some caulking around brick/metal," an inspector wrote in January, noting that some spots were "as large as a quarter."

55.     Other locations were found to have several issues with leaking and pooling water, including a puddle found with "a green algal growth," and condensation that was found to be "dripping over product being held."

56.     After inspectors flagged one of the condensation leaks for the company, workers tried to mop up the leaks. "The employee wiped a third time, and the leaks returned within 10 seconds," inspectors wrote after one condensation issue was raised on July 27, 2024, near fans that looked to be blowing the liquid onto uncovered deli meats.

57.     In February 2024, an inspector found "ample amounts of blood in puddles on the floor" and a "rancid smell" throughout a cooler used at the plant. A number of records also flag sightings of insects in and around deli meats at the plant, including one instance that prompted the agency to tag more than 980 pounds of ham in a smokehouse hallway to be "retained" for an investigation.

58.     In June, another report flagged concerns over flies going in and out of "vats of pickle" left by Defendant in a room. "Small flying gnat like insects were observed crawling on the walls and flying around the room. The rooms walls had heavy meat buildup," the report notes. Other parts of the facility were also found to have bugs, including what looked to be "ants traveling down the wall," as well as a beetle and a cockroach.

59.     Further, prior to the outbreak, Defendant did not install any barriers that separated

the processing lines, and pallet jacks and product racks were moved between all processing lines and all blast coolers, in violation of the standard of care and which the USDA found to constitute inadequate controls to prevent the spread of bacteria throughout the processing environment.

60.     The USDA further found that prior to the outbreak, Defendant failed to have a written plan to describe employee practices and use of personal protection equipment ("PPE") when moving between processing lines, which led to employees freely moving among lines without changing PPE, which is in violation of the standard of care. Moreover, Defendant's employees who handled garbage, conducted maintenance, removed condensation, and removed debris from floors were permitted to freely move between lines without proper sanitation and PPE, in further violation of the standard of care.

61.     Prior to the outbreak, the USDA also found that Defendant allowed beaded condensation to exist on door openings and inside at least one blast cell, dripping over and contaminating product.

62.     The USDA confirmed that Defendant had an intentional practice of failing to maintain sanitary conditions during processing, handling, and storing of product.

63.     In sum, Defendant's failure to impose and enforce adequate sanitation practices and its noncompliance with Sanitation Standard Operating Procedures and Sanitation Performance Standards, the *Listeria* Rule, and the sanitation requirements of 9 CFR § 416 at its Jarratt, Virginia facility since at least January 2022 caused or contributed to cause an outbreak of *Listeria* that contaminated the Boar's Head deli meats consumed by Decedent.

**Decedent's *Listeria* Infection**

64.     On or about July 22, 2024, Plaintiff purchased Boar's Head ham from a Publix located at 1575 Old Trolley Rd. in Summerville, South Carolina. Unbeknownst to Plaintiff, the Boar's Head deli meat he purchased, and his wife consumed, was contaminated with the Outbreak Strain of *Listeria* from Defendant's plant in Jarratt, Virginia.

65.     In June 2024, Decedent was diagnosed with small-cell lung cancer. She began chemotherapy on July 30, 2024, causing her to be immunocompromised.

66.     Decedent initially responded well after receiving chemotherapy, with only a reduced appetite. However, beginning on August 3, 2024, Decedent became increasingly lethargic.

67.     On August 4, 2024, Decedent was taken via EMS to the emergency department due to decreased responsiveness, with symptoms including confusion, lethargy, decreased food and water intake, diarrhea, and generalized weakness. She was admitted to the hospital on August 5, 2024.

68.     Blood cultures collected on August 4, 2024, were positive for *Listeria monocytogenes*, confirming that Plaintiff was suffering from a *Listeria* infection. Due to the changes in her mental status, Decedent's physicians suspected she was suffering from *Listeria meningitis*, putting her at "extremely high risk for life-threatening decompensation."

69.     From her admission on August 5, 2024, until her death on August 7, 2024, Decedent remained significantly encephalopathic, and her condition rapidly deteriorated. During her hospitalization, Decedent's *Listeria* bloodstream infection resulted in overwhelming sepsis and multi-organ dysfunction, which included her central nervous, hepatic, and hematologic systems, as confirmed by a sepsis screening. Despite antibiotic therapy with ampicillin and trimethoprim-sulfamethoxazole, Decedent's compromised immune system could not overcome the *Listeria*

sepsis, and she died on August 7, 2024.

70.    The South Carolina Department of Health confirmed that Decedent's *Listeria* culture and the ham purchased by Plaintiff on July 22, 2024, were a WGS match to the Outbreak Strain, and noted that Decedent's death was related to Defendant's Outbreak.

71.    Decedent's injuries and death were caused by Defendant's tainted food.

72.    As a direct and proximate result of the incident made the basis of this litigation, Decedent suffered and incurred severe and permanent injuries, pain, suffering, damages, and death.

73.    By reason of the injuries to and death of Decedent, the Estate of Vicki Sue Neve has paid for necessary medical treatment, hospitalization, and funeral expenses.

74.    As a further direct result of being sickened by Defendant's defective food product, Decedent, prior to her premature death, sustained bodily injury and suffered great pain and suffering and emotional anguish all to her damage in an amount exceeding the jurisdictional requirements of this Court.

75.    The conduct of the Defendant as described in this Complaint was aimed at the public (including Decedent), was grossly unjust, and involved high moral culpability for which punitive damages should be assessed against Defendant and awarded to Plaintiff in a sum of money to be determined by the trier of fact.

76.    As a further direct result of Defendant's conduct, Plaintiff, as Decedent's surviving spouse, a wrongful death beneficiary and the personal representative of her estate, suffered the loss of his spouse; the loss of consortium; the loss of companionship, comfort, love, and guidance from his spouse; the loss of services, protection, care, and assistance expected to be performed by his spouse; extreme mental anguish, emotional pain, and grief; and incurred financial expenses associated with the death of Decedent, including funeral expenses, entitling Plaintiff to

compensatory and punitive damages from these harms and losses and any and all other damages recoverable under the laws of the State of South Carolina.

## COUNT ONE
### (Strict Liability)

77.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

78.     One who sells a product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. S.C. Code Ann. § 15-73-10(1).

79.     At all times material and relevant to this Complaint, Defendant sourced, processed, manufactured, produced, distributed, marketed, and sold the contaminated and/or adulterated deli meat that is the subject of this action.

80.     Defendant is ordinarily engaged in the business of sourcing, processing, manufacturing, producing, distributing, marketing, selling, and/or placing deli meats on the market and/or in the stream of commerce, and did source, process, manufacture, produce, distribute, sell, market, and/or place contaminated and/or adulterated deli meats on the market and/or in the stream of commerce during the incident made the basis of this litigation.

81.     The contaminated deli meat was, at the time it left Defendant's control, defective and unreasonably dangerous for its ordinary and expected use by ordinary consumers because it was contaminated by *Listeria*, a virulent and deadly bacterial pathogen.

82.     The contaminated deli meat was unreasonably dangerous because it created a strong likelihood of injury to individuals such as Decedent if it was consumed in the normal and expected

manner.

83.    Deli meat contaminated with *Listeria* is extremely and unreasonably dangerous if consumed. Moreover, ordinary consumers like Decedent cannot detect *Listeria* contamination.

84.    The contaminated deli meat Decedent consumed was contaminated with *Listeria* when it left Defendant's control. It reached Decedent in substantially the same condition and was used in the expected and intended manner when it was consumed by Decedent.

85.    Defendant owed a duty of care to the public, including Decedent, to process, manufacture, produce, distribute, market, and/or sell food products that were not adulterated, that were fit for human consumption, that were reasonably safe, and that were free of pathogenic bacteria or other substances injurious to human health. Defendant breached that duty by processing, manufacturing, producing, distributing, marketing, and/or selling deli meat contaminated with *Listeria*, which is patently unfit for human consumption and is unsafe and injurious to human health.

86.    As a direct and proximate result of Defendant's acts and omissions, Decedent consumed *Listeria*-contaminated deli meat that caused serious illness, damages, pain and suffering, and, ultimately, her death.

87.    As a direct and proximate result of Defendant's wrongful conduct and the defect of Defendant's product, Decedent sustained injuries, suffered pain and suffering, and suffered wrongful death, and her estate and Plaintiff as her surviving spouse, both individually and as a wrongful death beneficiary of the estate, suffered damages in an amount to be determined at trial.

88.    Plaintiff is therefore entitled to and hereby demands all damages available at law (including compensatory damages, special damages, and punitive damages) in an amount to be determined at trial.

## COUNT TWO
## (Negligence *Per Se*)

89.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

90.     At all times material and relevant to this Complaint, Defendant was engaged in the business of manufacturing, distributing, supplying, and introducing into the stream of commerce food products intended for human consumption.

91.     Decedent was a person of the type that Defendant might and should have reasonably expected to consume Defendant's goods, namely its deli meat products, and be affected by them.

92.     Decedent consumed a food product sourced, processed, manufactured, produced, distributed, marketed, and sold by Defendant that was adulterated because it contained *Listeria*, a deadly bacterial pathogen.

93.     Both federal law and South Carolina law prohibit the sale of adulterated food products.

94.     Defendant, as a provider of food products in the United States, owed a duty to Decedent to comply with 21 U.S.C. § 331 of the Federal Food, Drug, and Cosmetic Act, which states in part:

> The following acts and the causing thereof are prohibited:
>
> a. The introduction or delivery for introduction into interstate commerce of any food . . . that is adulterated or misbranded;
>
> b. The adulteration or misbranding of any food . . . in interstate commerce;
>
> c. The receipt in interstate commerce of any food . . . that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise.

95.     Pursuant to 21 U.S.C. § 342, a food is "adulterated" if it "bears or contains any

poisonous or deleterious substance which may render it injurious to health."

96.     Any product sold into interstate commerce that is contaminated with *Listeria* is adulterated, thereby violating federal law.

97.     Defendant, as a provider of food products to consumers in the State of South Carolina, also owed a duty to Decedent to comply with the South Carolina Food and Drug Act, S.C. Code Ann. §§ 39-25-10 *et seq*.

98.     Pursuant to S.C. Code Ann. § 39-25-30, the following acts within the State of South Carolina are prohibited:

> (1) the manufacture, sale, or delivery, holding, or offering for sale of any food or cosmetic that is adulterated or misbranded;
>
> (3) the receipt in commerce of any food or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery of it for pay or otherwise; …
>
> (5) the dissemination of any false advertisement regarding any food or cosmetic; … [and]
>
> (7) the giving of a guaranty or undertaking which guaranty or undertaking is false, except by a person who relied on a guaranty or undertaking to the same effect signed by, and containing the name and address of the person residing in the State from whom he received in good faith the food or cosmetic[.]

S.C. Code Ann. § 39-25-30.

99.     According to S.C. Code Ann. § 39-25-100, a food shall be deemed adulterated:

> (1) If it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health; … or (3) if it consists in whole or in part of a diseased, contaminated, filthy, putrid, or decomposed substance, or if it is otherwise unfit for food; or (4) if it has been produced, prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered diseased, unwholesome, or injurious to health[.]

S.C. Code Ann. § 39-25-100(a).

100.    Any product sold in the State of South Carolina that is contaminated with *Listeria* is adulterated, violating South Carolina law.

101.    Consistent with the standard of care, S.C. Code Ann. § 39-25-30(1) prohibits the manufacture, sale, or delivery, holding, or offering for sale any food that is adulterated. Defendant breached this duty by not taking the appropriate steps to ensure its plant was properly sanitized and its food products were appropriately manufactured, processed, stored, and packaged so they were safe for consumption.

102.    South Carolina Code Ann. § 39-25-30(5) prohibits the dissemination of any false advertisement in connection with food. Defendant breached this duty by stating that its food products, including its ham, were safe for human consumption when it knew, or should have known, that it was likely tainted with poisonous bacteria.

103.    South Carolina Code Ann. § 39-25-30(7) prohibits the giving of a guaranty or undertaking concerning a food, which guaranty, or undertaking is false. Defendant breached this duty by stating that its food products, including its ham, were safe for human consumption when it knew, or should have known, that it was likely tainted with poisonous bacteria. Defendant falsely promised the following:

- "Our products are of unquestionable quality, without compromise, using only the best natural ingredients and nothing else."

- "With Boar's Head, you can trust each and every one of our products was prepared with the utmost care."

- That Boar's Head is "the brand consumers can count on for the highest quality delicatessen products in America."

- Boar's Head has "a passion to deliver on our promise for freshness and quality."

- "At Boar's Head, we are committed to providing the highest quality delicatessen products. Nothing less."

- "[W]e are relentless about quality. If a product doesn't live up to our exacting standards, it doesn't carry the Boar's Head name. Simple as that."

- "That's why Boar's Head has been the deli brand you can trust for over 115 years."

- That consumers deserved "better quality . . . than what was [otherwise] available."

- "Our standards for quality have never wavered."

- We "only use the finest ingredients."

- "Commitments like these have made us a leader in our industry and have made Boar's Head the brand in which consumers continue to place their trust."

- "Since 1905, our standards of quality have never wavered."

- "Our mission is to continue to be recognized as the leading provider of exceptional customer service and superior quality delicatessen products."

- "HIGHER STANDARDS FOR PREMIUM FOODS"

- Defendant also advertised certifications and partnerships with the American Heart Association, indicating that its products are "heart healthy," and the Feingold Association, a non-profit that "spreads awareness of the role of foods and synthetic additives in behavior, learning, and health."

- "We are proud to work with the American Heart Association® in its Food Certification Program and others."

- Defendant also made express promises to Publix and other retailers that its products were safe for human consumption, free of all adulterants, and made with the highest standards of quality and wholesomeness.

104. Decedent is a member of the class of people for whose protection S.C. Code Ann. § 39-25-30 and the South Carolina Food and Drug Act were enacted.

105. By sourcing, processing, manufacturing, producing, distributing, marketing, selling, and/or placing into interstate commerce the deli-meat products that were contaminated with *Listeria*, Defendant violated 21 U.S.C. § 331 and was therefore negligent *per se*.

106. By processing, manufacturing, producing, distributing, marketing, selling, and/or placing into the stream of commerce in the State of South Carolina deli-meat products that were contaminated with *Listeria*, Defendant violated S.C. Code Ann. § 39-25-30 and was therefore negligent *per se*.

107. The acts and omissions of Defendant in violation of these laws proximately and directly caused the injuries and damages sustained by Decedent.

108. As a direct and proximate result of Defendant's wrongful conduct and *per se* negligence, Decedent sustained injuries, suffered pain and suffering, and suffered wrongful death, and her estate and Plaintiff as her surviving spouse, both individually and as a wrongful death beneficiary of the estate, suffered damages in an amount to be determined at trial.

109. Plaintiff is therefore entitled to and hereby demands all damages available at law (including compensatory damages, special damages, and punitive damages) in an amount to be determined at trial.

## COUNT THREE
### (Negligence, Gross Negligence, Recklessness, Failure to Warn, and Willful Conduct)

110. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

111. At all times material and relevant to this Complaint, Defendant was engaged in the business of manufacturing, distributing, supplying, and introducing into the stream of commerce food products intended for human consumption.

112. Decedent was a person of the type that Defendant might and should have reasonably expected to consume Defendant's goods, namely its deli-meat products, and be affected by them.

113. Defendant owed a duty to all consumers, including Decedent, to produce food that was safe to eat, that was not adulterated or contaminated by harmful bacterial pathogens, and that

was not in violation of applicable food safety regulations.

114.    Consistent with the standard of care, Defendant had a duty to Decedent and others to avoid manufacturing, distributing, supplying, and introducing into the stream of commerce contaminated food, including its ham. Defendant breached this duty by failing to employ the proper and necessary protocols and practices required by the standard of care to ensure its food products were manufactured, processed, stored, packaged, and sold free of bacteria, including *Listeria.*

115.    Consistent with the standard of care, Defendant also owed a duty to Decedent and others to use supplies and raw materials that complied with federal, state, and local food laws, ordinances, and regulations, including without limitation the South Carolina Food and Drug Act, S.C. Code Ann. §§ 39-25-10 *et seq.*; that were safe and reliable sources; that were clean, wholesome, and free from adulteration; and that were safe for human consumption and for their intended purposes. Defendant breached this duty.

116.    Further consistent with the standard of care, Defendant owed a duty to Decedent and others to use reasonable care in the handling, manufacture, processing, storage, and distribution of their meat products to keep them free of contamination with *Listeria*. Defendant breached this duty.

117.    Furthermore, at all relevant times, Defendant was fully aware of the egregious conditions at its plant, and knew, or should have known, that such conditions were breeding grounds for the presence and spread of *Listeria.*

118.    Furthermore, Defendant had actual and constructive knowledge that its food was likely contaminated with *Listeria* and other bacteria given the egregious conditions that Defendant allowed to exist at its plant, and Defendant further knew, or should have known, that consuming

its food products, including its ham, would be extremely dangerous to consumers.

119.    At all times material and relevant to this Complaint, Defendant knew or had reason to know that the presence of bacteria, including *Listeria,* in the food was not obvious to or readily discoverable by Decedent and other consumers.

120.    At all times material and relevant to this Complaint, Defendant had a duty to warn Decedent and others of the egregious condition of its plant and that its food was likely contaminated with bacteria, including *Listeria*. Defendant breached this duty in that Defendant did not warn Decedent of the condition of its plant nor that its food was likely contaminated with bacteria, including *Listeria,* despite knowing of the egregious conditions of its plant and the likelihood of the presence of bacteria from such conditions.

121.    The food that Defendant manufactured, sold, distributed, and supplied was unmerchantable as to Decedent and not fit for its ordinary purpose, and Defendant knew that at the time it sold, distributed, and supplied the product for Decedent's consumption that it was unmerchantable, but failed to warn Decedent and others of this fact.

122.    Defendant negligently and/or wantonly breached these duties by, among other acts and omissions:

> a. failing to comply with the *Listeria* Rule;
>
> b. failing to comply with Sanitation Standard Operating Procedures and Sanitation Performance Standards;
>
> c. failing to adequately inspect and test the facilities and instruments used in the sourcing, processing, manufacturing, production, distribution, marketing, and sale of deli meat products;
>
> d. failing to maintain proper sanitation in its Jarrett, Virginia facility and equipment therein;
>
> e. failing to adequately inspect and test its deli meat products;

f. failing to follow safe practices in the sourcing, processing, manufacturing, production, distribution, marketing, storage, packaging, handling, labeling, and transportation of its deli meat products;

f. failing to follow sanitary practices in the sourcing, processing, manufacturing, production, distribution, marketing, storage, packaging, handling, labeling, and transportation of its deli meat products;

g. failing to warn distributors, retailers, and consumers of the adulteration or potential adulteration of its deli meat products;

h. misrepresenting the quality, safety, and suitability for consumption of its deli meat products; and

i. other acts and omissions as revealed through discovery.

123.    Defendant's actions as described herein were grossly negligent, reckless, and constituted utter and wanton disregard for Decedent's rights and safety.

124.    As a direct and proximate result of Defendant's negligent, gross negligent, reckless, and willful breaches of duties and noncompliance with applicable law and safety regulations, Decedent sustained injuries, suffered pain and suffering, and suffered wrongful death, and her estate and Plaintiff as her surviving spouse, both individually and as a wrongful death beneficiary of the estate, suffered damages in an amount to be determined at trial.

125.    Plaintiff is therefore entitled to and hereby demands all damages available at law (including compensatory damages, special damages, and punitive damages) in an amount to be determined at trial.

## COUNT FOUR
## (Breach of Express Warranty)

126.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

127.    Defendant is a manufacturer, distributor, supplier, and seller of deli-meat food products and the components thereof. Defendant, through its manufacture, distribution, supply,

and sale of deli-meat food products, expressly warranted that its products were reasonably safe for their ordinary and foreseeable purpose (*i.e.*, consumption). S.C. Code Ann. § 36-2-313(1).

128.    Defendant did not disclaim the warranties.

129.    To the contrary, Defendant marketed its deli-meat products expressly promising that they were healthy and safe for consumption.

130.    Defendant was the manufacturer, distributor, supplier, and seller of the deli-meat product consumed by Decedent that caused her exposure to the *Listeria* infection.

131.    Decedent was a person of the type that Defendant might and should have reasonably expected to consume Defendant's goods, namely its deli-meat products, and be affected by them.

132.    Among other misrepresentations, Defendant falsely promised the following, which Plaintiff relied upon in deciding to purchase, and Decedent relied on in deciding to consume, Defendant's ham:

- "Our products are of unquestionable quality, without compromise, using only the best natural ingredients and nothing else."

- "With Boar's Head, you can trust each and every one of our products was prepared with the utmost care."

- That Boar's Head is "the brand consumers can count on for the highest quality delicatessen products in America."

- Boar's Head has "a passion to deliver on our promise for freshness and quality."

- "At Boar's Head, we are committed to providing the highest quality delicatessen products. Nothing less."

- "[W]e are relentless about quality. If a product doesn't live up to our exacting standards, it doesn't carry the Boar's Head name. Simple as that."

- "That's why Boar's Head has been the deli brand you can trust for over 115 years."

- That consumers deserved "better quality . . . than what was [otherwise] available."

- "Our standards for quality have never wavered."

- We "only use the finest ingredients."

- "Commitments like these have made us a leader in our industry and have made Boar's Head the brand in which consumers continue to place their trust."

- "Since 1905, our standards of quality have never wavered."

- "Our mission is to continue to be recognized as the leading provider of exceptional customer service and superior quality delicatessen products."

- "HIGHER STANDARDS FOR PREMIUM FOODS"

- Defendant also advertised certifications and partnerships with the American Heart Association, indicating that its products are "heart healthy," and the Feingold Association, a non-profit that "spreads awareness of the role of foods and synthetic additives in behavior, learning, and health."

- "We are proud to work with the American Heart Association® in its Food Certification Program and others."

- Defendant also made express promises to Publix and other retailers that its products were safe for human consumption, free of all adulterants, and made with the highest standards of quality and wholesomeness.

133.    Plaintiff was a consumer who relied on each of Defendant's express warranties in deciding to purchase Defendant's ham, and Decedent was the consumer who relied on each of Defendant's express warranties in deciding to consume Defendant's ham.

134.    The deli-meat products manufactured, supplied, and sold by Defendant were contaminated with *Listeria,* a potentially fatal pathogen. As such, the deli-meat food products were unreasonably dangerous for their ordinary and foreseeable use.

135.    The deli-meat food products were contaminated with *Listeria* when they left the possession and control of Defendant and were subsequently consumed by Decedent.

136.    Defendant breached the express warranty of the safety of its goods for their expected and foreseeable purpose. As a direct and proximate result of Defendant's wrongful conduct, the defect of Defendant's product, and Defendant's breach of the express warranties,

Decedent sustained personal, economic, and other injuries, suffered pain and suffering, and suffered wrongful death, and her estate and Plaintiff as her surviving spouse, both individually and as a wrongful death beneficiary of the estate, suffered damages in an amount to be determined at trial.

137.    Plaintiff is therefore entitled to and hereby demands all damages available at law (including actual, incidental, and consequential damages) in an amount to be determined at trial.

### COUNT FIVE
### (Breach of Implied Warranties of Merchantability and Fitness)

138.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

139.    Under South Carolina law, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. S.C. Code Ann. § 36-2-314(1).

140.    Further, under South Carolina law, where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose. S.C. Code Ann. § 36-2-315.

141.    By offering its food products for sale to the general public, Defendant impliedly warranted that its food products were merchantable and fit for human consumption.

142.    Defendant's contaminated deli meat contained *Listeria* and therefore was not merchantable, was not fit for human consumption, and was injurious to health.

143.    As a direct and proximate result of Defendant's acts and omissions, Decedent consumed *Listeria*-contaminated deli meat that caused serious illness.

144.    As a direct and proximate result of Defendant's wrongful conduct, the defect of

Defendant's product, and Defendant's breach of the implied warranties of merchantability and fitness for a particular purpose, Decedent sustained personal, economic, and other injuries, suffered pain and suffering, and suffered wrongful death, and her estate and Plaintiff as her surviving spouse, both individually and as a wrongful death beneficiary of the estate, suffered damages in an amount to be determined at trial.

145.    Plaintiff is therefore entitled to and hereby demands all damages available at law (including actual, incidental, and consequential) in an amount to be determined at trial.

WHEREFORE, Plaintiff Steven Neve, individually and as Personal Representative of the Estate of Vicki Sue Neve, deceased, demands a jury trial and prays for judgment against Defendant for actual, incidental, nominal, consequential, compensatory, general, special, and punitive damages in an amount greater than Seventy-Five Thousand Dollars ($75,000.000),  attorney's fees, costs, and for such other and further relief as this Court deems just and proper.

*[Signature Page to Follow]*

Respectfully submitted,


By: s/ *James L. Ward, Jr.*

William S. Jackson IV (Fed. ID No. 13047)
wjackson@steinberglawfirm.com
THE STEINBERG LAW FIRM, LLC
103 Grandview Dr., Suite A
P.O. Box 2670
Summerville, SC 29484
(843) 871-6522 - office
(843) 871-8565 - facsimile

James L. Ward, Jr. (Fed. ID No. 6956)
jward@mcgowanhood.com
McGOWAN, HOOD, FELDER & PHILLIPS, LLC
10 Shem Drive, Suite 300
Mount Pleasant, SC 29464
(843) 388-7202 - office
(843) 388-3194 - facsimile

*Attorneys for Plaintiff*

January 9, 2026
Mount Pleasant, SC